# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GEORGE BOERNER,

               Plaintiff,

v.

LVNV FUNDING LLC and
MESSERLI & KRAMER PA,

               Defendants.

Case No. 17-CV-1786-JPS

**ORDER**

## 1.      INTRODUCTION

On December 22, 2017, Plaintiff George Boerner ("Boerner") filed a complaint against defendants LVNV Funding, LLC ("LVNV") and Messerli & Kramer, PA ("Messerli") (collectively, "Defendants") alleging violations of the Federal Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692(e) and the Wisconsin Consumer Act ("WCA"), Wisc. Stat. § 427.104, in connection with the collection of a credit card debt. (Docket #1). On November 7, 2018, Messerli filed a motion for summary judgment, which LVNV joined. (Docket #38 and #45). For the reasons stated below, the motions will be denied.

## 2.      LEGAL STANDARD

Federal Rule of Civil Procedure 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

The Seventh Circuit has provided additional direction in evaluating the viability of FDCPA claims. Such claims are assessed from the perspective of the "unsophisticated consumer." An unsophisticated consumer "may be uninformed, naïve, [and] trusting, but is not a dimwit, has rudimentary knowledge about the financial world, and is capable of making basic logical deductions and inferences[.]" *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012) (citations and quotations omitted).

**3.     RELEVANT FACTS**

George Boerner held a Menard's/Capital One credit card, for which he fell behind on payments after he lost his job. Between October 2016 and February 2017, Boerner received billing statements in the mail that contained information including the amount due and the payment due date. As is customary with credit card billing statements, Boerner was allowed to make partial payments, or "minimum payments," on the debt. Boerner owed a total of $1,957.57 on the Menard's/Capital One credit card before it was finally turned off ("charged off") in early 2017. By February 2017, Boerner was required to pay $649.00 on the total owed balance. At some point following the charge off, the Menard's/Capital One credit card debt was sold. It passed through multiple financial institutions and

ultimately arrived at LVNV, which retained the Messerli law firm to collect on the delinquent account.

On June 19, 2017, Messerli sent Boerner's bankruptcy attorney a standard form letter stating that it represented LVNV in the collection of the debt, and, if appropriate, Boerner must dispute the validity of the debt within 30 days. (Docket #40-2). Boerner does not recall seeing this letter and, to this day, is confused by the fact that it refers to HSBC Bank Nevada, a bank Boerner has never used. The letter does not contain any information regarding Boerner's opportunity to cure the default, nor does it mention that the debt stems from Boerner's Menard's/Capital One card. It does, however, list the last four digits of that credit card. *Id*. Neither Boerner, nor his attorney, responded to this letter. On October 25, 2017, Messerli filed a summons and complaint against Boerner in Washington County Circuit Court, seeking to collect LVNV's debt (Case No. 17SC2061). On November 16, 2017, Boerner filed an answer with the state court, followed by an amended answer and counterclaims on December 15, 2017.

LVNV is a long-term client of the Messerli firm, and Messerli is familiar with LVNV's business practices and accounts. When retained to collect a particular debt, Messerli receives consumer files from LVNV, as well as general demographic information about the debtor. State court complaints are drafted on a standard form template, which Messerli attorneys review "at least annually." (Docket #50 at 10–11). Messerli regularly trains its employees on legal compliance and industry developments. *Id.* Messerli attorneys use a file-tracking system to show work performed on each case. (Docket #53 at 7).

The Messerli attorney working on behalf of LVNV in Boerner's case, James Kachelski, is listed as the attorney of record in several hundred cases

throughout Wisconsin.[1] The state court complaint filed in Boerner's case was the result of Messerli's mass-produced, computer-assisted process, which Kachelski reviewed and signed before the complaint was filed. There is no way to know for certain how long Kachelski actually spend reviewing the complaint, *id.* at 8, and the parties dispute how long Kachelski reviewed the complaint. Messerli's records contain two time stamps for this complaint, at 4:04 p.m. and 4:05 p.m. Boerner argues that this shows that the complaint was reviewed for one minute before it was sent to the assistant to be filed. Messerli argues that 4:04 p.m. is "the time the code was placed on the file *after* the review was completed," which is then followed by the time the file was sent to the assistant to be e-filed, and that all of the review was done *prior* to the time stamps. (Docket #50 at 12). In any case, the Defendants do not say how long Kachelski spent reviewing the complaint, or how long it would be reasonable to review the complaint under the circumstances. They only state that Kachelski's review, however long it was, was reasonable. *Id.* at 13.

It is undisputed that Kachelski reviewed the complaint on October 23, 2017, and the complaint was ultimately filed on October 25, 2017. *Id.* There are no other entries from that period on the computer system for Boerner's case that can be attributed to any other attorney. The parties dispute how busy Kachelski's schedule was that week, including the

---

[1]As of December 14, 2017, Boerner reports that Kachelski was an attorney of record in 590 cases in Dane County, 116 of which were "open," meaning there was no judgment yet entered. Additionally, he was entered in 383 cases in Brown County, 45 of which were open; 449 cases in Waukesha County, 71 which were open; 329 cases in Racine County, 67 of which were open; and 2,909 cases in Milwaukee County, 607 of which were open.

number of hearings for which he made appearances. At some point after the complaint was filed, another attorney, Gina Ziegelbauer, became involved in Boerner's case.

**4.     ANALYSIS**

The thrust of Plaintiff's argument is that LVNV unlawfully accelerated the maturity of his debt when LVNV filed suit against him without giving Plaintiff notice of his right to cure the default under the WCA, which, in turn, violated 15 U.S.C. § 1692e(2)(A) because LVNV falsely represented the legal status of the debt, i.e., that the debt was ready to be sued upon. Plaintiff also alleges that Messerli falsely represented that an attorney was meaningfully involved in the collections suit when, in fact, Kachelski was barely involved at all, in violation of 15 U.S.C. § 1692e(3).  In its July 25, 2018 order on Defendants' motion to dismiss, the Court determined that Boerner could proceed on his two FDCPA claims, one of which is predicated on facts underlying the WCA the violation, which the court determined was precluded from litigation in federal court due to its dismissal in the state court action. (Docket #32 at 18–19). Defendants now seek summary judgment on each of Boerner's claims, as well as dismissal of the entire action. The Court addresses each FDCPA claim below, as well as Defendants' argument against emotional damages.

**4.1     FDCPA**

The FDCPA is, as its name suggests, intended to "eliminate abusive debt collection practices." 15 U.S.C. § 1692(e) "Broadly, it prohibits debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.'" *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465–66 (7th Cir. 2018) (quoting 15 U.S.C. § 1692e).

It contains a number of subsections which regulate certain debt collection practices, two of which, sections 1692e(2)(A) and 1692e(3), are at issue here.[2]

### 4.1.1    15 U.S.C. 1692e(2)(A)

A debt collector may not falsely represent "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Like the FDCPA, the WCA was enacted to protect consumers from unfair business practices, and is liberally construed to this effect. Wis. Stat. § 421.102(1); *Kett v. Comm. Credit Plan, Inc.* 228 Wis. 2d 1, 18 (1999); *Credit Acceptance Corp. v. Chao Kong*, 344 Wis. 2d 259, 263 (Ct. App. 2012). Under the WCA, a debt collector must give a debtor notice of the right to cure and wait 15 days before accelerating a debt or commencing an action to collect on the debt. Wis. Stat. § 425.105(1).

Defendants first argue that LVNV had the right to sue Boerner because Boerner no longer had a "right to cure" where the credit card balance was entirely past due and fully owed. (Docket #39 at 7). Defendants refer to *Rosendale State Bank v. Schultz*, which holds that if "the customer defaults on an entire obligation, there is no right to cure." 123 Wis. 2d 195, 199 (Ct. App. 1985). Boerner counters that the amount was not "fully owed" because Boerner had been permitted to make partial payments on the account, and, as far as he knew, would be allowed to make these payments for years to come, until the debt was paid off. (Docket #46 at 3–4).

Boerner's position is supported by prior decisions in this district. In *Johnson v. LVNV Funding*, the court distinguished debts that are "fully due" from debts that involve "installment payments," such as credit cards with

---

[2]Defendants also argue that Boerner's claim under Wis. Stat. § 427.104 fails. (Docket #39 at 13–14). The Court previously dismissed this state law claim (Docket #32 at 17), and Boerner does not dispute this. (Docket #46 at 15).

minimum payments and a maximum credit amount. 2016 WL 676401, at *5 (E.D. Wis. Feb. 18, 2016). A right to cure default exists for installment payments such as those permitted for credit card debts. *Rosendale*, 123 Wis. 2d at 199; *Johnson*, 2016 WL 676401 at *4. Defendants argue that because they purchased the debt from Capital One, "there was no possibility Boerner could cure his failure to make regular monthly payments on his credit card debt. Boerner did not have (and never had) any type of continuing open and revolving credit relationship with LVNV that could have been restored from a defaulted status. LVNV Funding is not a creditor." (Docket #39 at 8).

LVNV made a similar argument in *Johnson*, which the court struck down because "LVNV, as assignee, stepped into the shoes of the original creditor" when it purchased the debt. "What [Capital One] and LVNV did regarding accounting and ownership of [Boerner's] Account after a default cannot change the nature of [Boerner's] credit relationship with [Capital One] and eliminate [his] rights under the WCA. Consumers should not lose their consumer rights based on a creditor's choice to sell or assign the debt." 2016 WL 676401, at 5. Accordingly, that court noted that the plaintiff "was entitled to a right to cure before the debt was accelerated and a collection lawsuit was brought." *Id.*

The debt in this case is also a credit card debt with minimum payments and a credit limit, such that Boerner could pay the installments over the course of several years. (Docket #44 at 5–20). Based on Boerner's billing statements from Menard's/Capital One, the credit card statement amount was not treated as "fully owed," but rather as a balance that could be paid off with "minimum payments." *Id.* Under the WCA and *Rosendale*, Boerner would be entitled to an opportunity to cure the default before any acceleration or collection commenced. The fact that the debt changed hands

does not change this. To echo *Johnson*, a debt-collector cannot step into a better position than its assignor where the consumer's rights are concerned. Therefore, the Court finds that Boerner "was entitled to a right to cure before the debt was accelerated and a collection lawsuit was brought." *Johnson*, 2016 WL 676401, at *5.

Next, Defendants argue that they were not obligated to give notice because the WCA is permissive. Wis. Stat. § 425.104(1) (a "merchant who believes that a customer is in default *may* give the customer written notice of the alleged default…"). Boerner counters that he has a right to such notice, and states that LVNV was a merchant within the scope of the WCA, but inexplicably shifts the burden to the Defendants to "show that [a notice of right to cure default] was not required." (Docket #46 at 5). Boerner's argument that he has the right to such notice is correct, but for different reasons than the ones he suggests.

Defendants are not the first creditors to argue that Wis. Stat. § 425.104 is permissive, and this Court will not be the first court to find that Defendants' argument is meritless. In construing the language of Section 425.104, courts tend to look to Sections 425.105 and 425.103 in order to determine the relative obligations of creditors before they can commence a suit. *Johnson*, 2016 WL 676401, at *4; *Quorum Fed. Credit Union v. Rumpf*, 2016 WL 8606258, at *2 (Wis. App. Ct. May 24, 2016).

Wis. Stat § 425.103(3) requires that "[a] cause of action with respect to the obligation of a customer in a consumer credit transaction *shall be* subject to this subchapter, including the provisions relating to cure of default (§§ 425.104 and 425.105)." (emphasis added). Wis. Stat § 425.105(1), in turn, states:

> A merchant *may not* accelerate the maturity of a consumer credit transaction, commence any action except as provided in § 425.205(6), or demand or take possession of collateral or goods subject to a consumer lease other than by accepting a voluntary surrender thereof (§ 425.204), *unless the merchant believes the customer to be in default (§ 425.103), and then <u>only upon</u> the expiration of 15 days after a notice is given pursuant to § 425.104 if the customer has the right to cure under this section.*

(emphasis added). It has already been established that Boerner had the right to cure the default because the debt was not yet "fully owed." *See supra* at 7. Accordingly, the statute required Defendants to wait until "the expiration of 15 days after a notice is given" before they "accelerate[d] the maturity of a consumer credit transaction [or] commence[d] any action." In effect, Wis. Stat § 425.105(1), as it pertains to accelerated credit transactions or commenced legal actions, renders notice pursuant to Wis. Stat. § 425.104(1) a requirement. *See Johnson*, 2016 WL 676401, at *4 (noting that although § 425.104 "sounds permissive, any cause of action regarding the obligation of a customer in a consumer credit transaction 'shall be' subject to the provisions relating to the right to cure a default") (citing and quoting Wis. Stat. §§ 425.105(1), 425.103(3)); *Quorum*, 2016 WL 8606258, at *2 (observing that a merchant "'may' decide not to accelerate the loan or commence an action, but if he makes the decision to do so, such action is not allowed until fifteen days after a notice complying with §425.104 is given.").[3]

---

[3]Defendants argue that "open-ended accounts such as credit card accounts do not have a maturity…[so] there is no loan maturity date to accelerate with a credit card." (Docket #50 at 4). Wis. Stat § 421.103 does not define the term "accelerate." The Court understands "acceleration" to occur when a debt previously paid via installments, (be it a mortgage, where acceleration clauses are common, or a credit card balance, where such clauses are less common), is called due. In the case of a mortgage, a loan maturity date might be accelerated; in the case of a credit card balance, a final payment due date. In both cases, the borrower

In this case, Defendants commenced an action in state court and accelerated Boerner's debt, which he had previously paid in installments, to a final amount due immediately, without providing him with notice and an opportunity to cure the default. Defendants did not *have* to accelerate the loan or commence the action. However, once they chose to pursue those actions, under Wis. Stat. §§ 425.103(3) and 425.105(1), Defendants were required to issue notice pursuant to Wis. Stat. § 425.104 and then wait 15 days before taking either course of action.

Finally, Defendants argue that Menard's/Capital One's monthly billing statements constituted notice under the WCA. Plaintiff argues that this is contrary to the purposes of the WCA. Indeed, in *Johnson*, this district held that "treating a monthly billing statement as both that and a notice of right to cure goes against the purposes of the WCA. . .An unsophisticated consumer would reasonably not know or understand the difference." *Johnson*, 2016 WL 676401, at *6. The Court further notes that such a finding in Defendants' favor would render Wis. Stat. §§ 425.104, 425.105 superfluous. *See e.g., Quorum*, 2016 WL 8606258, at *3. Therefore, these billing statements do not qualify as notice.

---

would be required to pay the principal balance and interest immediately. Additionally, the statute generally refers to acceleration of the "maturity of a consumer credit transaction." Wis. Stat § 425.105. A loan can mature, or become due, at various points and under various conditions. The statute makes no reference to a "fixed maturity," which would imply a date certain that the debt matures. In any event, even if the Defendants had not accelerated the debt, they did commence an action, so the statutes still apply.

Defendants also take issue with Boerner's use of the phrase "accelerate the debt" rather than "accelerate the maturity date," but this is an acceptable turn of phrase. *See Quorum*, 2016 WL 8606258, at *2.

#### 4.1.1.1 Federal Preemption

Defendants advance an argument that Capital One, a federally-chartered financial institution, was not required to follow the WCA because federal law preempts it. In support of this contention, Defendants provide correspondence between the Wisconsin Department of Financial Institutions ("DFI") and the Kohn Law Firm (which is not involved in this case), which, according to Defendants, concludes that right to cure requirements are preempted by federal law.[4] Boerner makes many arguments seeking to exclude the letters. Evidentiary squabbling aside, there are two reasons why this argument fails. First, as a threshold issue, the Defendants have not complied with the requirements needed to establish such a safe harbor. Second, even if they had, the Wisconsin statute is clearly not preempted, and the Court would have determined any contrary findings from the DFI to be invalid for the reasons explained below.

Wis. Stat. § 426.104(b)(2) provides a "safe harbor" for "any act, practice or procedure" submitted to a DFI examiner ("the Administrator") in writing and either approved or "not disapproved" of within 60 days of the written request, notwithstanding subsequent revisions, rescissions, or judicial determinations that the approval was invalid. Though the text of the statute does not explicitly state that these approvals are individualized determinations, the caselaw suggest that these letters are discrete permissions rather than broadly applicable decisions that carry the force of

---

[4]The Court is it not bound by the Wisconsin DFI's findings as they relate to federal law. *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir. 1997); *Turner v. Perales*, 869 F.2d 140, 140 (2d Cir. 1989); *Amisub (PSL), Inc. v. State of Colo. Dept. Soc. Serv.*, 879 F.2d 789, 796 (10th Cir. 1989).

precedent. For example, in *Aker v. Americollect, Inc.*, the Seventh Circuit determined that the safe harbor applied where the debt collector contacted the Administrator to request permission to add a percentage interest on medical debts, responded to the Administrator's request for additional information, and did not receive a disapproval for 60 days. 854 F.3d 397, 399 (7th Cir. 2017). By contrast, in *Moore v. Always Towing & Recovery Inc.*, this district determined that the safe harbor did not apply where a creditor used a previously approved DFI form because "[t]he fact that a creditor uses the DFI form does not mean that the DFI administrator approved the way the creditor used it, nor does it trump the creditor's obligation to comply with the statute." 2018 WL 4233005, at *9 n.1 (E.D. Wis. Sept. 5, 2018). Here, Defendants did not contact the Administrator regarding their plan before they acted. Rather, the Kohn law firm submitted a request to the Administrator *after* Defendants filed this case, and based their request on different facts involving a different set of parties. Defendants cannot simply rely on another law firm's request for the safe harbor to protect their actions retroactively. The safe harbor does not apply.

Defendants also contend that 12 C.F.R. §§ 7.4008(d)(4),(8), which permit banks to make loans without regard to state laws dealing with "term to maturity, including circumstances under which a loan may be called due and payable" or "other credit-related documents" preempts the WCA, which states that a creditor "may not accelerate the maturity of a consumer credit transactions" unless the creditor provides notice and the opportunity to cure the default. Wis. Stat. § 425.105. However, 12 C.F.R. § 7.4008(e) explicitly states that certain state laws "are not preempted. . . and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank of Marion County*."

*Barnett Bank* asks whether the state and federal statutes are in "irreconcilable conflict" with each other. 517 U.S. 25, 31 (1996). If there is an irreconcilable conflict (i.e., if the federal statute authorizes an activity that the state statute "expressly forbids"), then the federal statute preempts *unless* the purpose of the federal statute "is to grant the bank only a very limited permission. . .to the extent that state law also grants permission." *Id.* In the latter case, the state law controls. In either case, the "purpose of [the enacting body] is the ultimate touchstone in every pre-emption case." *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996) (quotations omitted).

Claims that are rooted in state consumer protection laws fall in "an area that is traditionally within the state's police powers to protect its own citizens." *Aguayo v. U.S. Bank*, 653 F. 3d 912, 917 (9th Cir. 2011). "Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area.'" *Id.* (quoting *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990)); *see also First Nat. Bank v. Commonwealth of Ky.*, 76 U.S. 353, 362 (1869) (noting that banks' "right to collect their debts, and their liability to be sued for debts, are all based on State law."). It is well established that where federal law extends to "a field which the States have traditionally occupied. . . [Courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless it was the clear and manifest purpose of Congress." *Lohr*, 518 U.S. at 485.

In keeping with this principle, the regulation at issue includes a savings clause (i.e., a provision limiting the scope of the regulation) that applies to areas of law that are traditionally the purview of state law, including contracts and rights to collect debts. 12 C.F.R. § 7.4008(e)(1)(4); *see also* 69 FR 1904-1 at 1912 (Jan. 13, 2004) (explaining that the regulation

would not preempt laws that are "incidental to national banks' lending authority" and "form the legal infrastructure" for banking). When interpreting a federal law with a savings clause, courts should "look to the provisions of the whole law, and to its object and policy." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987). Additionally, in light of the fact that the Office of the Comptroller of the Currency [OCC] "has explicitly disavowed full field preemption," when evaluating these particular regulations, courts should "consider both express preemption and savings clauses together." *Aguayo*, 653 F.3d at 922 (citing *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 729 (1985)).

12 C.F.R. § 7.4008(e) makes clear that certain state laws apply to national banks, subject to the *Barnett Bank* inquiry, including "(4) rights to collect debts." 12 C.F.R. § 7.4008(e)(4); *see also Cline v. Bank of Am.*, 823 F. Supp. 2d 387, 399 (S.D. W. Va. 2011) (finding consumer protection statutes that are generally applicable to all debt collectors were not preempted by 12 C.F.R. § 7.4008); *Capital One Banks (USA), N.A. v. Denboer*, 791 N.W. 2d 264, 272 (Iowa 2010) (finding that a provision in the state's consumer credit code that required a complaint to include information sufficient to calculate the amount owed was not preempted because it "only incidentally affect[ed] the exercise of national banks' non-real estate lending powers.").

To confirm that the Wisconsin law at issue, which falls within the savings clause, is not preempted by the rest of the regulation, the Court applies the test set forth in *Barnett Bank*. The first inquiry is whether the laws are in "irreconcilable conflict." They are not. The federal regulation governs loans issued by national banks, and explicitly provides that debt collection laws, which apply in certain situations after a loan is extended, are not preempted. The Wisconsin statute governs debt collection *after* the

default of those loans. The requirement that a debt collector—in this case, a state debt collector—issue a notice *after* a consumer defaults is "incidental to the national bank's lending authority." 69 FR 1904-1 at 1912; *see also Aguayo*, 653 F.3d at 927–28 (post-repossession notice was not an "other credit-related document" under Section 7.4008 where OCC "specifically contemplated exemption of debt collection from preemption."). Moreover, the Wisconsin state statute is broadly applicable to all creditors, and does not discriminate against national banks in favor of state banks. Wis. Stat. § 425.102. Accordingly, it is not preempted.

### 4.1.2    15 U.S.C. § 1692e(3)

A debt collector may not falsely represent or imply "that any individual is an attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(3). This extends to representations or omissions made in state court filings. *Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 811 (7th Cir. 2016). A debt collector violates Section 1692e(3) when a communication purports to come from an attorney who in reality was not involved in or supervising the process of creating and sending the communication. *See Nielsen v. Dickerson*, 307 F.3d 623, 635 (7th Cir. 2002); *Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996).[5]

---

[5] Defendants argue that the FDCPA applies only to communications with consumers, and does not extend to representations made to state court judges. (Docket #39 at 16); *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 941 (7th Cir. 2011). However, *O'Rourke* is not on point. *O'Rourke* dealt with an attorney's misrepresentations to a judge, which were made in pursuit of a default judgment in light of an Illinois statute that required proof of allegations in the pleadings. That is not the case here, where an attorney ostensibly filed suit against a debtor, thereby communicating to the debtor that the action had commenced.

There is evidence in the record that could lead a reasonable jury to find that Kachelski was not meaningfully involved in the litigation. In *Nielsen*, a law firm comprised of three attorneys and approximately 20-25 legal staff provided legal services and expertise to debt collectors. 307 F.3d at 626. The firm stayed abreast of legal developments, maintained specific collections procedures, and conducted regular legal training for staff. *Id.* The firm was contracted by a debt collector to perform checks on consumers and send dunning letters to consumers who were past due on payments. *Id.* In compiling these letters, the firm formatted and verified the accuracy of consumer data, and then sent the data to a printing and mailing service, which created the dunning letters. *Id.* The letters were then subject to a three-step review governed by a checklist, with an attorney at the firm conducting the final review. *Id.* at 627.

In finding a lack of meaningful attorney involvement, *Nielsen* took issue with the following factors: first, the law firm only received information from accounts selected by the creditor—the law firm did not decide who to pursue, but simply conducted additional, ministerial screening. *Id.* at 635–36. Second, the law firm did not receive the debtor's file, only the information needed to determine delinquency and draft the letter. *Id.* at 636. Third, the review of the letters, even if conducted by an attorney, "did not call for the exercise of professional judgment. The most substantive aspect of this review involved checking an internal database to determine whether a debtor had declared bankruptcy and running a [screening] computer check." *Id.* Fourth, the dunning letter was on a pre-written form letter that contained "no individualized assessment of the individual debtor's circumstances or her liability," and was issued in an "assembly-line fashion" that "betray[ed] the purely nominal nature" of the

law firm's participation. *Id.* The court found that the attorney's testimony that he spent two minutes reviewing one page containing forty accounts confirmed the "ministerial nature" of the review. *Id.* Fifth, the firm was not authorized to resolve issues with the debtor, and routed almost all communication back to the creditor. *Id.* Finally, the attorney never litigated on behalf of the creditor. *Id.* The firm's efforts "amounted to no more than a veneer of compliance with the FDCPA." *Id.* at 639.

To be sure, certain factors weigh in Defendants' favor here. Messerli does actively litigate on behalf of LVNV in state court, and it seems that they do receive the entire client file. However, a number of other factors remain uncertain. First, it is unclear who determines which files LVNV sends to Messerli—i.e., whether LVNV only sends the delinquent accounts it wants litigated, or whether Messerli conducts some exercise of professional judgment to determine which claims to pursue. It is also unclear whether Messerli has a policy for sending notices of right to cure to eligible consumers, nor is it clear whether Messerli even makes such determinations. The record summarily states that a "Messerli shareholder review[s] the documentation provided to determine" the viability of a claim, (Docket #50 at 11), but "[i]n the instant case, on October 20, 2017, a legal assistant with Messerli reviewed Boerner's file for suit." (Docket #42 ¶ 8). The facts are unclear, and a reasonable jury could find that there was no professional judgment exercised regarding whether and how to pursue these claims.

Second, it does not appear that Messerli attorneys exercise any professional judgment in the review of the complaint. Defendants argue that "Messerli's expensive computer system. . .provides easy access to. . . account information allowing for an efficient review at the time of the

summons and complaint review." (Docket #50 at 14). Defendants do not describe what this "efficient review" entails, but note that although the client data is transferred electronically from LVNV to Messerli, "the data imported from clients is still reviewed by Messerli attorneys." (Docket #52 at 2). It is hard to see how a data review is meaningfully different from the "ministerial review" that the *Nielsen* court rejected, and a jury could reasonably find in favor of Boerner on this factor.

Third, the pre-made, assembly-line fashion of the complaints, as well as the evidence of Kachelski's schedule could also confirm the "ministerial nature" of his review of these complaints. Additionally, although Messerli apparently *had* Boerner's file, there is no evidence that Kachelski reviewed this file in fashioning the complaint. Kachelski stated that he "examined [Boerner's] file information in Messerli's Cogent program to review the Summons and Complaint for accuracy." (Docket #42 at 2). The Court notes that "reviewing the file information," i.e., reviewing data scraped from the file, is different from "reviewing the file." Thus, a reasonable jury could find in favor of Boerner on these factors as well. Finally, Defendants make much of the fact that, at some point after the filing of the complaint, another attorney was assigned to manage the file. However, those facts fail to demonstrate whether any attorney was meaningfully involved at the outset of the complaint, when Boerner asserts that his rights were violated.

In the end, there are simply too many material facts at issue here to resolve on summary judgment. Although there was certainly some attorney involvement, it is unclear whether there was meaningful attorney involvement. Therefore, this is an issue that must be submitted to a jury.

#### 4.1.2.1　　　　Materiality

In order to be actionable, the misrepresentation must be material, i.e., it must influence an unsophisticated consumer's decision as to when and whether to pay a debt. *Hahn v. Triumph LLC*, 557 F.3d 755, 757–58 (7th Cir. 2009). Defendants argue that the only thing that affected when and whether Boerner would pay his debts was the fact that he lost his job and did not have any money—nothing in the complaint changed this. (Docket #39 at 17). Yet there is evidence that Boerner would have been interested in curing the debt, if he could afford it, and if he were offered that opportunity. (*E.g.*, Docket #51-1 at 115:12, 18–19; 126:1–2). Instead, he and his wife focused their resources on litigating the matter.[6] Accordingly, there is evidence in the record that the complaint materially affected Boerner's decision to respond to the debt.

### 4.2　　Emotional Damages

The evidence before the Court on damages is relatively thin, but not so insubstantial as to warrant summary judgment in Defendants' favor. Parties seeking emotional damages "must provide the court with a reasonably detailed explanation of the injuries suffered." *Crafton v. Law Firm of Jonathan B. Levine*, 957 F. Supp. 2d 992, 1003 (E.D. Wis. 2013) (quotations and citations omitted); *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003). When "the injured party's own testimony is the only proof of

---

[6]There is also evidence in the record that Boerner thought the debt was a scam because he did not understand the source of the debt or recognize various intermediary banks through which the debt had passed before arriving at LVNV. *Id.* at 127:6–15. Although this does not go to the merits of the action, it sheds light on the degree of confusion that an unsophisticated consumer feels when faced with the opaque, labyrinthian practices of the modern debt industry.

emotional damages, he must explain the circumstances of his injury in reasonable detail; he cannot rely on mere conclusory sentences." *Id.* at 929. "Conclusory statements that receiving [a complaint] caused [him] stress. . . do not constitute a detailed explanation of [his] injuries." *Crafton*, 957 F. Supp. 2d at 1003 (quotations omitted). "The actual damages must arise from the false representation. . .—not the mere fact of [the lawsuit]." *Id.* Put another way, Boerner cannot claim damages just because he is being sued— rather, he must demonstrate that his damages stem from the alleged misrepresentation within the state court lawsuit.

Boerner has met his burden of explaining the physical and mental effects of the LVNV lawsuit in sufficient detail for this stage of the litigation. He testified that he suffers a loss of appetite that resulted in him shedding ten pounds from an already frail frame (Docket #51-1 at 118:10–11). He has increased his smoking to over a pack of cigarettes per day, *id.* at 118:2–3, and he experiences a chronic, low-grade headache as a result of the LVNV lawsuit, *id.* at 119:6–7, that intensifies in the evenings when he reviews the lawsuit materials, *id.* at 120:20–22. His hands shake from the nerves, *id.* at 114:12–16, and he has difficulty concentrating at work. *Id.* at 100:19–21. He describes his anxiety about this lawsuit as all-consuming, if not in those terms. Boerner is a 71-year-old veteran who has an annual physical exam approximately every year, and, aside from that, does not go to a doctor unless he is "almost dead." *Id.* at 132:1. His last medical exam was in October, 2017, therefore there are no medical records documenting his stress. *Id.* at 35:4. The weight and credibility of this evidence should go to the jury.

Moreover, Boerner's heightened stress appears to be directly related to the acceleration of the debt and the initiation of the state court lawsuit

without the opportunity to cure the default. Defendants try to exploit Boerner's confusion between the state and federal court proceedings, and, at times, attempt to pin Boerner's stress on this federal lawsuit, which hardly makes sense. (Docket #39 at 28). Boerner apparently believed that his deposition was for the LVNV state lawsuit, and was agitated because he believed that the LVNV state lawsuit would result in a garnishment of wages. (Docket 51-5 at 109:17–23, 110:2–5). He fears that the LVNV state court judgment will result in an unnegotiated garnishment that he cannot afford. *Id.* at 110:5. He is also concerned that such a garnishment will negatively affect his workplace reputation. *Id.* at 134:9–13.

5. **CONCLUSION**

For the reasons discussed above, Defendants' motions for summary judgment on the FDCPA claims and the issue of emotional damages will be denied. In addition to their motions for summary judgment, Defendants filed an uncontested motion to extend the trial schedule. (Docket #54). However, when considered against the backdrop of the Court's comprehensive trial scheduling order issued on June 11, 2018 (Docket #30), the motion becomes a non-starter and will be denied.

Accordingly,

**IT IS ORDERED** that Messerli & Kramer PA's and LVNV Funding LLC's motions for summary judgment (Docket #38 and #45) be and the same are hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Defendants' unopposed motion for extension of time (Docket #54) be and the same is hereby **DENIED.**

Dated at Milwaukee, Wisconsin, this 8th day of January, 2019.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge